UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

RAUL PEREZ,

                Petitioner,

v.

GREGORY SKIPPER,

                Respondent.

_____/

Case No. 1:20-cv-1197

Honorable Phillip J. Green

## **OPINION**

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254.  The parties have consented to the conduct of all proceedings in this case, including entry of a final judgment and all post-judgment motions, by a United States Magistrate Judge. (ECF Nos. 12, 13, 14.)

Petitioner Raul Perez is incarcerated with the Michigan Department of Corrections at the Carson City Correctional Facility (DRF) in Carson City, Montcalm County, Michigan.  On August 31, 2017, following a four-day jury trial in the Kent County Circuit Court, Petitioner was convicted of first-degree murder, in violation of Mich. Comp. Laws § 750.316.  On September 25, 2017, the court sentenced Petitioner as a third habitual offender, Mich. Comp. Laws § 769.12, to life imprisonment without the possibility of parole.

On December 8, 2020, Petitioner signed his § 2254 petition and placed it in the prison mailing system. The habeas corpus petition raises three grounds for relief, as follows:

I.   The state court decision was contrary to, or involved an objectionably unreasonable application of clearly established federal law, and. or an objectionably unreasonable determination of the facts in light of evidence presented in the trial court, when it denied that the trial court abused its discretion by allowing the prosecution to present MRE 404(b) evidence that the defendant had been charged with operating under the influence and had given a false name to the police whether the evidence had no probative value and was unfairly prejudicial.

II.  The state court decision was contrary to, or involved an objectionably unreasonable application of clearly established federal law, and/or an objectionably unreasonable determination of the facts in light of evidence presented in the trial court, when it denied that the prosecution presented insufficient evidence to support a conviction of deliberate and premeditated murder where the conviction is based only on the fact that the victim was strangled to death.

III. The state court decision was contrary to, or involved an objectionably unreasonable application of clearly established federal law, and/or an objectionably unreasonable determination of the facts in light of evidence presented in the trial court, when it denied that the trial court committed plain error when it allowed the admission of the videotaped interview of Raul Perez where the interview was conducted without a translator which negated any assurances that when he signed a *Miranda* statement that he understood his right to remain silent and his right to counsel.

(Pet., ECF No. 1, PageID.3-8.) Respondent asserts that Petitioner has procedurally defaulted his third ground for relief and that all three of his claims lack merit. (ECF No. 8.) For the following reasons, the Court concludes that Petitioner has failed to set forth a meritorious federal ground for habeas relief and will, therefore, dismiss his petition for writ of habeas corpus.

<u>**Discussion**</u>

**I.    Factual Allegations**

The Michigan Court of Appeals described the facts underlying Petitioner's

prosecution as follows:

> On October 25, 2016, Perez's daughter, Kimberly, arrived home from
> work sometime before 11:00 p.m.  About 20 minutes later, Perez arrived
> intoxicated at Kimberly's apartment and asked her for a ride.  While
> Kimberly prepared to leave, Perez began talking about "weird stuff," and
> said that if Kimberly "didn't see him the next day, he would be okay, not
> to worry about him."  When Kimberly questioned Perez about what he
> meant, Perez said he was "going to go away and then take some people
> with him."  He specifically mentioned Karla Magana, the woman who he
> "was currently with."[]  Kimberly testified that she did not take Perez's
> comments seriously because he was drunk and was "just talking
> nonsense."
>
> Kimberly explained to the jury that Perez tried to call someone but that
> person would not answer.  When they were getting ready to leave,
> Perez's phone rang and he answered it.  Kimberly heard him say, "[H]ey,
> can I see you[?]" and "[M]y daughter will take me.  I'll be fine."  When
> they were on the road, Perez called someone again—Kimberly believed
> it was Magana, the same person as before.  Perez said, "I'm almost
> there," "Come outside," and "I love you."  They arrived at Magana's
> house, and Magana got into Kimberly's car.  Perez asked Kimberly to
> drive them back to the apartment complex where both Perez and
> Kimberly lived in separate apartments.  During the ride back, Perez and
> Magana were holding hands and kissing.
>
> At around 4:00 or 5:00 a.m., Perez called Kimberly and said, "I just
> wanted to tell you I love you, and I'm sorry for not being there for you."
> Kimberly asked Perez what he was talking about and whether he was
> still drinking.  Perez said, "I'm being serious, I love you, and just saying
> sorry for everything."  Perez then told Kimberly that he "did something
> really bad," and indicated that "he had killed the lady."  Kimberly
> assumed that Perez was still drunk and that he and Magana must have
> argued.  Perez said, "[J]ust know that I love you," and ended the phone
> call.  After seeing her father's suitcase in the hallway later that morning,
> Kimberly called the police.  Kimberly let the police into Perez's
> apartment with her spare key, and Magana's body was discovered in the
> bathroom.  Perez was passed out on his bed.

A neighbor who lived in the apartment above Perez's unit testified that around 1:15 a.m. she heard "[a] lot of screaming, banging, glass breaking, and thumping." She remembered hearing both a male and a female voice ,primarily speaking in Spanish. Although the neighbor did not speak Spanish and could not understand everything she heard, it sounded as if the woman was being hurt. The witness recalled that the female voice, speaking in English, screamed, "[W]hy are you doing this to me[?]" The commotion "slowed down for a little while" at about 2:00 a.m., but then "picked back up again." She said that there was "maybe about 15, 20 minutes of quiet" during the whole episode, which continued until approximately 3:00 or 3:30 a.m.

A forensic pathologist explained that Magana suffered multiple severe injuries and had been manually strangled to death. He described several blunt-force injuries to her face as well as several sharp-force injuries, including to her nose and right hand. Magana had defensive-type wounds on her hands. The pathologist explained that manual strangulation requires "a significant amount of force being applied for several minutes[.]" In his opinion, Magana would have passed out after approximately 20 seconds but may have regained consciousness if that force released and blood flow returned. He estimated that it would probably take five minutes or longer for death to occur from manual strangulation.

A detective interviewed Perez shortly after his arrest. Perez confessed to killing Magana using his hands and explained that he was jealous because she wanted to leave him for another man. Perez also admitted that Magana was aware that he had recently been arrested and released after giving the police a false name. Perez referred to this as a "problem" because he feared that she would go to the police and expose his deceit. In Perez's own words, Magana intended to end her relationship with Perez and threatened, "[I]f you don't leave me alone, I'm going to the police and tell who you really are."

*People v. Perez*, No. 340697, 2019 WL 1270642, at *1–2 (Mich. Ct. App. Mar. 19, 2019)

(footnote omitted).

The jury heard testimony over the course of two days from Petitioner's daughter, the victim's neighbor, a number of police officers, a forensic pathologist, and Petitioner. (Trial Tr. II & III, ECF Nos. 9-9, 9-10.) The jury deliberated for about four hours before reaching its verdict. (Trial Tr. IV, ECF No. 9-11, PageID.503–504.)

4

The court sentenced Petitioner to mandatory life imprisonment on September 25, 2017. (Sentencing Tr., ECF No. 9-12.)

Petitioner, with the assistance of appointed counsel, appealed his conviction and sentence, raising the same three issues he now raises in his § 2254 petition. *See Perez,* 2019 WL 1270642 at *1. On March 19, 2019, the court of appeals affirmed Petitioner's conviction and sentence. *Id.* Petitioner then filed a *pro per* application for leave to appeal to the Michigan Supreme Court. On September 10, 2019, the Michigan Supreme Court denied Petitioner's application for leave to appeal. (ECF No. 9–14, PageID.745.) This § 2254 petition followed.

## II. AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone,* 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren,* 959 F.3d 704, 721 (6th Cir. 2020) (quoting *Harrington v. Richter,*

562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (internal quotation marks omitted)).   This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in

existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664. "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly

established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits.  *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies."  *Stermer*, 959 F.3d at 721.  Then, the petitioner's claim is reviewed *de novo*.  *Id*.  (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## III.   Discussion

### A.      404(b) Evidence

In his first ground for relief, Petitioner contends that the trial court abused its discretion by allowing the prosecution to "present MRE 404(b) evidence that [he] had been charged with operating under the influence and had given a false name to the police." (ECF No. 1, PageID.4.)  Petitioner avers that such evidence "had no probative value and was unfairly prejudicial."  (*Id*.)  During the third day of trial, Detective Robert Robinson testified that during his interview of Petitioner, "there was mention that she threatened to call the police, or contact the police if he didn't leave her alone, and explain what he did and how he used a false name." (ECF No. 9-10, PageID.467.)  Moreover, Petitioner himself testified in response to a juror question that he had been arrested for drunk driving on October 21, four days before Magana's death.  (*Id*., PageID.484.)  Petitioner also referenced the arrest under a false name during his

custodial interview, a transcript of which was submitted to the jury.  (ECF No. 9-2.) The Michigan Court of Appeals rejected this claim, concluding that the evidence was admissible under Michigan Rule of Evidence 404(b).  *Perez*, 2019 WL 1270642, at *2–3.

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters.  *Seymour*, 224 F.3d at 552 (6th Cir. 2000).  Thus, to the extent that Petitioner asserts that the state courts erred under Michigan law, he fails to state a claim upon which habeas relief may be granted.  State courts are the final arbiters of state law, and the federal courts will not intervene in such matters.  *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently.  The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts.  *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000); *see also Stewart v. Winn*, 967 F.3d 534, 538 (6th Cir. 2020) (stating that, to obtain habeas relief based on an allegedly improper evidentiary ruling, a petitioner must identify "a Supreme Court case establishing a due process right with regard to the *specific kind of evidence* at issue").  Petitioner vaguely suggests that the court of appeals' decision is an unreasonable application of *United States v. Brady*, 595 F.2d 359 (6th Cir. 1979).  *Brady*, however, is a Sixth Circuit decision, not a Supreme Court case.  Moreover, the evidence at issue in *Brady* involved photographs of the victim, not testimony regarding prior bad acts.  *See id.* at 361.  Petitioner fails to identify any clearly established Supreme Court precedent that would preclude admission of the testimony at issue, regardless of whether it was covered by Rule 404(b).  *See Burger v. Woods*, 515 F. App'x 507, 510 (6th Cir. 2013) (even if the trial court violated Michigan Rule of Evidence 404(b), such "'garden-variety' character-evidence error does not 'cross the constitutional threshold' of due process").  Petitioner has not met this high standard and, therefore, is not entitled to habeas relief on this ground.[1]

---

[1] Within his first ground for relief, Petitioner also vaguely contends that he was denied his Sixth Amendment right to confront the witnesses against him "during the arrest and trial procedures" because he was not provided with a translator. (ECF No.

### B.      Sufficiency of the Evidence

Petitioner next contends that the prosecution presented insufficient evidence "to support a conviction of deliberate and premeditated murder where the conviction is based only on the fact that the victim was strangled to death." (ECF No. 1, PageID.5.)

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court announced the following standard for resolving sufficiency claims: the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319.  The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*.  Witness credibility remains the province of the jury, *see Herrera v. Collins*, 506 U.S. 390, 401–02 (1993), and an attack on witness credibility constitutes a challenge to the quality, but not the sufficiency of the government's evidence.  *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002).  The habeas court need only examine the

---

2, PageID.27.) Specifically, Petitioner asserts that he was unable to confront "his daughter and the police who arrested and questioned him." (*Id.*, PageID.28.)  The Confrontation Clause gives the accused the right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990).  Petitioner's daughter and the arresting officers testified at his trial, and Petitioner, through counsel, had the opportunity to cross-examine them.  Moreover, Petitioner was provided an interpreter throughout trial.  Thus, Petitioner is not entitled to relief regarding his Confrontation Clause argument.

evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196–97 (6th Cir. 1988).

Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). This standard erects "'a nearly insurmountable hurdle'" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

In resolving Petitioner's sufficiency challenge, the Michigan Court of Appeals stated with respect to the standard of review:

> "In determining whether sufficient evidence exists to sustain a conviction, this Court reviews the evidence in the light most favorable to the prosecution, and considers whether there was sufficient evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt." But more importantly, "[t]he standard of review is deferential: a reviewing court is *required* to draw all reasonable inferences and make credibility choices in support of the jury verdict. The scope of review is the same whether the evidence is direct or circumstantial. Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." "It is for the trier of fact, *not the appellate court*, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." [*People v. Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018) (citations omitted; alteration in original).]

*Perez*, 2019 WL 1270642, at *4.  Although the appellate court cited state court authority for the standard, the standard applied is identical to *Jackson*.  Moreover, if one looks to *Oros* and the cases cited therein in support of the standard, eventually the source of the standard is identified as *Jackson*.  *See People v. Nowack*, 614 N.W.2d 78, 81 (Mich. 2000).  Thus, there is no question that the state court applied the correct standard.

After stating the appropriate standard, the court of appeals followed it.  The court of appeals identified the essential elements of first-degree murder, focusing on the elements of premeditation and deliberation.[2]  *See Perez*, 2019 WL 1270642, at *4–5.  The court then reviewed the record evidence in a light most favorable to the prosecution, stating:

> There is ample evidence supporting [Petitioner's] conviction in this case. [Petitioner] made highly incriminating statements both before and after Magana's death. Before Magana's death, he suggested to his daughter that she should not worry if she did not see him the next day and that he was planning to take Magana with him. Afterward, [Petitioner] himself suggested a motive by acknowledging that Magana intended to leave him and threatened to tell the police that he had given them a false name after his recent arrest. [Petitioner's] neighbor testified that she overheard a heated altercation lasting several hours, during which she heard a female voice, presumably Magana, scream, "[W]hy are you doing this to me[?]" The neighbor also recalled a 15 to 20 minute period

---

[2] The court of appeals' statement of the elements, including premeditation, and what is required to demonstrate those elements are purely matters of state law.  It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions.  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  The decision of the state courts on a state-law issue is binding on a federal court.  *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983).  The Sixth Circuit has, therefore, recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'"  *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76).

when the altercation seemed to ebb, which was plenty of time for [Petitioner] to have considered his next action. Finally, the forensic pathologist testified that some of Magana's injuries were consistent with a defensive struggle and that it could have taken approximately five minutes of applied force to actually cause death by manual strangulation. All of this evidence suggests that [Petitioner] had the opportunity for a "second look." Therefore, we conclude the evidence, considered in the light most favorable to the prosecution, was sufficient to uphold [Petitioner's] conviction.

*Perez*, 2019 WL 1270642, at *5.

Petitioner does not take issue with the court of appeals' statement of the evidence; rather, he contends that the court of appeals "took things out of proportion of the record." (ECF No. 2, PageID.30.) He opines that he had left suitcases at his daughter's house because he had been planning on leaving the state for over two weeks, and they were "specifically left to ensure he said goodbye to his daughter." (*Id.*, PageID.31.) He also avers that Magana said "why are you doing this to me" because she "would always ask why he did whatever his position was to her, because it would cause her to change her mind because of the feelings they had for each other." (*Id.*) Petitioner maintains that his daughter never "revealed that Magana was not afraid of her father and would accuse him of doing things to change her mind all the time, which she would do because of feelings for her father." (*Id.*, PageID.32.)

The Supreme Court has separated sufficient from insufficient evidence by assessing whether the finding could be based on reasoned inference or only speculation. *Coleman v. Johnson*, 566 U.S. 650, 655 (2012). And, importantly, the *Coleman* Court provided some guidance with respect to the distinction. Based on the Court's analysis, a reasonable inference is an inference that a rational factfinder could make from the facts. That is hardly an earth-shattering revelation and it is not

a particularly onerous burden.  The Court went so far as to say, "the only question under *Jackson* is whether [a] finding is so insupportable as to fall below the threshold of bare rationality."  *Id*. at 656.

To succeed in his challenge, Petitioner cannot simply reject the identified inferences, complain that there are other equally compelling—or even more compelling—inferences, or declare the identified inferences to be speculation.  He must show that the identified inferences are irrational.  That is a heavy burden; that is undoubtedly why the Sixth Circuit describes the *Jackson* standard as "'a nearly insurmountable hurdle.'"  *Davis*, 658 F.3d at 534 (quoting *Oros*, 578 F.3d at 710).

None of what Petitioner avers was presented via the testimony at trial. Petitioner has not met this burden by relying on his own interpretation of testimony presented at trial.  Petitioner simply has not shown that the court of appeals' detailed analysis of the evidence and the inferences drawn from that evidence, particularly regarding premeditation and deliberation, are irrational.  This Court is only required to look at the evidence in a light that favors the prosecution and assess whether a rational factfinder could conclude that Petitioner is guilty beyond a reasonable doubt in light of that evidence.  It is up to the jury to decide issues of credibility, to decide between conflicting accounts, and draw inferences—so long as the inferences are rational.  Petitioner's invitation to focus on inferences that favor him—inferences that are not even supported by the record evidence—is inappropriate.

Petitioner has failed to demonstrate that the court of appeals' determination that there was sufficient evidence to support the verdict is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, he is not entitled to relief on this ground.

### C.    Admission of Petitioner's Videotaped Interview

In his last ground for relief, Petitioner contends that the trial court erred by allowing the admission of his videotaped interview because it was conducted without a translator, "negat[ing] any as[s]urances that when he signed a *Miranda* statement that he understood his right to remain silent and his right to counsel." (ECF No. 2, PageID.34.)

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966) (internal quotes omitted), the Supreme Court held that, in order to protect an individual's Fifth Amendment privilege against self-incrimination, when an individual is in custody, law enforcement officials must warn the suspect before his interrogation begins of his right to remain silent, that any statement may be used against him, and that he has the right to retained or appointed counsel. *Id.* at 478–79; *see also Dickerson v. United States*, 530 U.S. 428, 435 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994).

A waiver of *Miranda* rights must be done knowingly, voluntarily, and intelligently. *Miranda*, 384 U.S. at 444. This inquiry "has two distinct dimensions." *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). First, the waiver must have been the product of a free and deliberate

choice, without coercion, intimidation, or deception. *Moran*, 475 U.S. at 421. Second, the waiver must have been made with a full awareness of the right being abandoned and the consequences of the decision to abandon the right. *Id.* An individual need not know every possible consequence of a waiver, however. *Spring*, 479 U.S. at 574. Instead, the requisite inquiry is whether the "suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.* The remedy for a *Miranda* violation is the exclusion at trial of any ensuing self-incriminating statements. *See Chavez v. Martinez*, 538 U.S. 760, 772 (2003).

As an initial matter, Respondent first contends that Petitioner's claim is procedurally defaulted because he "failed to comply with a state procedural rule that requires defendants to object to an involuntary confession at trial." (ECF No. 8, PageID.222.) When a state law default prevents further consideration of a federal issue by the state, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether (1) the petitioner failed to comply with an applicable state procedural rule, (2) the state court enforced the rule so as to bar the claim, and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004).

As the court of appeals noted, Petitioner admitted that he did not object to the admission of his custodial interview at trial. *Perez*, 2019 WL 1270642, at *5. Because the issue was unpreserved, the court of appeals reviewed it for plain error. Plain error review, however, "does not constitute a waiver of state procedural default rules." *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). The court of appeals, therefore, relied upon a state procedural bar to deny Petitioner's claim. Moreover, this state procedural rule is adequate and independent because it was "firmly established and regularly followed" at the time of the asserted procedural default. *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991)). In 2011, the Michigan Supreme Court reiterated its position that "[o]ne who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *People v. Kowalski*, 803 N.W.2d 200, 211 (Mich. 2011) (quoting *People v. Carter*, 612 N.W.2d 144, 149 (Mich. 2000). Thus, this rule was well established at the time of Petitioner's trial.

If a petitioner procedurally defaulted his federal claim, the petitioner must demonstrate either (1) cause and prejudice—cause for his failure to comply with the state procedural rule (or fairly present the issue in the state courts) and actual prejudice flowing from the violation of federal law alleged in his claim—or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986); *Hicks*, 377 F.3d at 551–52. The miscarriage-of-justice exception only can be met in an "extraordinary"

case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536–37. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Here, Petitioner utterly fails to raise arguments regarding cause and prejudice or actual innocence. Petitioner, therefore, cannot overcome his procedural default of his third ground for relief.

Nevertheless, Petitioner is not entitled to relief because his third ground for relief is meritless. With respect to this ground, the Michigan Court of Appeals stated the following regarding the standard of review:

> "A suspect's waiver of his *Miranda* rights must be made 'voluntarily, knowingly, and intelligently.'" *People v. Tanner*, 496 Mich 199, 209; 853 NW2d 653 (2014), quoting *Miranda*, 384 US at 444. In *Tanner*, our Supreme Court recited the two-part inquiry necessary for determining whether a waiver was valid:
>
>> First, the relinquishment of the right must have been "voluntary," in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [*Tanner*, 496 Mich at 209, quoting *Moran v. Burbine*, 475 US 412, 421; 106 S. Ct. 1135; 89 L Ed 2d 410 (1986).]

[Petitioner] does not argue that the police utilized any intimidating, coercive, or deceptive tactics. Rather, [Petitioner] argues only that he did not understand the choice presented because of a language barrier and his intoxication. Accordingly, we consider the second part of the inquiry set forth in *Tanner* as to whether [Petitioner's] waiver was made with "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Tanner*, 496 Mich at 209.

In order to validly waive the right against compelled self-incrimination, the defendant need only have a "very basic understanding of those rights ...." *People v. Eliason*, 300 Mich App 293, 304; 833 NW2d 357 (2013) (quotation marks and citation omitted). Stated differently, "the test is not whether it was wise or smart to admit ... culpability." *People v. Tierney*, 266 Mich App 687, 710; 703 NW2d 204 (2005). In *Tierney*, this Court agreed with the trial court that the defendant's waiver was knowingly and intelligently made because the defendant acknowledged his rights and was willing to speak with the police officers, did not appear to be confused, and several officers testified that the defendant's intoxication, although not precisely known, "did not interfere with his ability to understand and to answer the questions posed to him." *Id.*

*Perez*, 2019 WL 1270642, at *5–6. Once again, while the court of appeals cited state court authority for the standard, the standard applied is identical to *Miranda*. Indeed, *Tanner* and *Tierney* both cite *Miranda*. Thus, there can be no doubt that the state court applied the correct standard.

After stating the appropriate standard, the court of appeals first considered Petitioner's argument regarding the language barrier:

There is no evidence clearly demonstrating that [Petitioner] did not understand the *Miranda* warning because of a language barrier. At the time of his arrest, [Petitioner] spoke to one of the arresting officers in English. He also responded appropriately to commands given in English. During the custodial interview, when asked whether he needed help understanding his rights, [Petitioner] responded, "I'm okay." Even so, the detective read [Petitioner] his rights a second time while permitting [Petitioner] to follow along on the written form and, again, [Petitioner] responded that he understood and signed the form indicating as much. Admittedly, there were moments during the interview when the detective struggled with [Petitioner's] accent, but

[Petitioner] corrected any misunderstandings. Viewing the totality of the exchange, [Petitioner] fairly demonstrated his ability to speak and understand English. We are satisfied that [Petitioner], although a native Spanish speaker, possessed a sufficient grasp of English to understand his rights.

*Id.* at *6.

During trial, Officer Hecksel also testified that Petitioner asked, in English, if "someone called about this." (ECF No. 9-9, PageID.430.)  Detective Robinson testified that during his interview of Petitioner, Petitioner was "able to follow [his] commands." (ECF No. 9-10, PageID.462.)   Detective Robinson was speaking to Petitioner in English, and Petitioner was responding in English. (*Id.*) He was "actively" answering Detective Robinson's questions.   (*Id.*)   Detective Robinson testified that Petitioner "actually spoke better than [Detective Robinson] did at understanding him." (*Id.*)   For example, Detective Robinson misunderstood Petitioner's use of the word "jealous," and Petitioner recognized that. (*Id.*)

Moreover, the transcript of Petitioner's custodial interview indicates that Detective Robinson read Petitioner his *Miranda* rights at the outset. (ECF No. 9-2, PageID.260–61.)   He asked Petitioner if he understood those rights; Petitioner responded that he did. (*Id.*, PageID.261.)   Petitioner did not respond when Officer Robinson asked if he would like to read the rights, but Officer Robinson again read them to Petitioner. (*Id.*)   When asked to do so, Petitioner signed the form indicating that he understood his rights. (*Id.*)   The court of appeals correctly noted that there were times that Detective Robinson had difficulty understanding Petitioner's accent, but that Petitioner corrected such misunderstandings.  In sum, the record reflects

that Petitioner understood his *Miranda* rights, even without the presence of a translator, and chose to talk to Detective Robinson anyway.

The court of appeals then considered Petitioner's argument regarding his level of intoxication:

> Similarly, we recognize that "[i]ntoxication from alcohol or other substances can affect the validity of a waiver of Fifth Amendment rights, but is not dispositive." *Id.* at 707. Rather, whether the waiver was knowingly and intelligently given "depends, in part, on the defendant's capacity." *Id.* At trial, the evidence varied as to the degree of [Petitioner's] intoxication throughout the time period in question. However, there is no reason for this Court to conclude that [Petitioner's] intoxication affected his ability to understand his rights and freely waive them. Although it is undisputed that [Petitioner] was drunk the night before, it seems that his level of intoxication had largely dissipated by the time of his arrest the following morning. The detective who conducted the interview testified that he had no concerns that [Petitioner] was still drunk because [Petitioner] followed directions, did not stumble, did not slur his speech, was coherent, and was actively answering the detective's questions. Several other officers also observed that, although there was an odor of alcohol present, there were no overt signs that [Petitioner] was overly intoxicated and that he was able to follow instructions and move about under his own power without stumbling.

*Perez*, 2019 WL 1270642, at *6.

During trial, Officer Hecksel testified that while he did smell a moderate "[odor] of intoxication" from Petitioner upon arrest, Petitioner was able to "walk under his own power" and did not "need to be dragged out." (ECF No. 9-9, PageID.430.)  Officer Sanderson testified that Petitioner had a "slight odor of alcohol on his breath, but he was walking fine.  He wasn't stumbling.  He walked out on his own."  (*Id.*, PageID.422.)  Other than the odor of alcohol, Petitioner "appeared to be completely normal."  Deputy Green also noticed a slight odor of alcohol, but did not "notice anything that would lead [him] to believe [Petitioner] was overly intoxicated."

(*Id.*, PageID.424.) Officer Weemhoff testified that he could smell alcohol coming from Petitioner, and that his speech was "kind of slurred." (*Id.*, PageID.428.) At the time of the interview, Petitioner was not stumbling and was not slurring his speech. (*Id.*) In sum, the record reflects that Petitioner's level of intoxication had dissipated such that it had no effect on Petitioner's knowing decision to speak to Defendant Robinson after being provided his rights.

From this Court's review of the record, the Court discerns that Petitioner has failed to demonstrate that the court of appeals' determination that no *Miranda* violation occurred is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, he is not entitled to habeas relief for this ground.

## IV. Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529

U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."   *Id.*   "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."   *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong.  Therefore, the Court will deny Petitioner a certificate of appealability.  Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## Conclusion

The Court will enter a judgment dismissing the petition and an order denying a certificate of appealability.

Dated:   April 18, 2022                          /s/ Phillip J. Green
                                                PHILLIP J. GREEN
                                                United States Magistrate Judge